**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-193-BAH** |
| **GREG RUBENACKER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Greg Rubenacker to 46 months' incarceration, 3 years of supervised release, $2000 in restitution, and the mandatory special assessments for each count of conviction.

### I.     INTRODUCTION

The defendant, Greg Rubenacker, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

Rubenacker pleaded guilty, without a plea agreement, to all ten counts in a superseding indictment, including three felonies: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Two);

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Three). In addition to these felonies, he pleaded guilty to three Class A misdemeanors, and four Class B misdemeanors. As explained herein, the Court should sentence Rubenacker to 46 months' incarceration, which is the mid-point of the advisory Guidelines range of 41-51 months.

Rubenacker was one of the first people to breach the Capitol, entering the Senate Wing Doors within 60 seconds of the initial breach of the building. Inside, he and other rioters chased United States Capitol Police Officer Eugene Goodman through part of the Capitol, while some rioters yelled, "He's one person, we're thousands!" and "where are they counting the votes?"— ignoring the officer's extended baton and repeated demands to "back up." Rubenacker, one of the first four or five rioters at the front of the mob, continued to chase Officer Goodman near the entrance to the Senate Chamber where Rubenacker berated other officers and nearby rioters screamed, "back up!" and "Go arrest the Vice President!" Rubenacker then exited the building, only to breach the Capitol again at a different location. This time, Rubenacker pushed down the Senate Hall toward the Senate Chamber before being rebuffed again by law enforcement deploying chemical-irritant spray. Retreating to the Rotunda, Rubenacker, in his own words, "smok[ed] out the Capitol," with what appears to be marijuana. When law enforcement began entering the Rotunda, Rubenacker refused to leave and confronted multiple officers, screaming that they were "communists." When officers formed a line to force rioters out, Rubenacker escalated in response: he swung a water bottle at one officer's head and threw liquid at other officers who were engaging with a rioter. Only after an officer sprayed chemical-irritant spray in Rubenacker's face did he finally leave the Capitol, over one hour after he initially breached the building.

2

Rubenacker later posted about his actions on Snapchat, merging multiple videos he had recorded inside the Capitol into one "story." Then, days after January 6, Rubenacker searched the internet for "fbi pictures of rioters" and methods to encrypt an iPhone—searches consistent with someone attempting to conceal evidence of his criminal actions. He later explained to another individual that he "fought for [their] constitutional rights."

Rubenacker has shown little, if any, remorse for his actions on January 6. A sentence of 46 months' incarceration is appropriate to reflect the gravity of Rubenacker's conduct.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, including Rubenacker, unlawfully broke into the Capitol to disrupt the peaceful transfer of power after the 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked a historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the Pretrial Sentencing Report (PSR) and the Joint Stipulation of Facts, a joint session of Congress had convened at approximately 1:00 p.m. at the Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the

vote count of the Electoral College of the 2020 presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate Chamber.

As the proceedings continued, a large crowd gathered outside the Capitol. Temporary and permanent barricades were in place around the exterior of the building, and Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate—including the President of the Senate, Vice President Pence—were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* PSR ¶¶ 18-24.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a

4

grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/ imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long, hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/ AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of

the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the Capitol. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork (including statues and murals), historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/ HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the Capitol, requiring the expenditure of over $2.7 million.

### B.    The Defendant's Role in the January 6, 2021 Attack on the Capitol

Greg Rubenacker played a prolonged role in the January 6 attack on the Capitol. His crimes are well documented through a variety of sources, including body worn camera from the Metropolitan Police Department, open-source videos and photographs, surveillance footage from inside of the Capitol, and video from Rubenacker's own social media and cellular phone.

Before the attack, Rubenacker traveled to Washington, D.C. from his home in New York. On January 6, he attended the "Stop the Steal" rally, where he recorded the crowd around him near the Washington Monument. "America is pissed," he wrote and later posted on Snapchat as part of a longer story.[2] The government has provided the Court with Rubenacker's Snapchat story. *See* Gov. Exhibit 1. A still from the video is below, showing his name (circled in red).

---

[2] Snapchat allows users to splice videos together and post the final product online as a "story."



***Rubenacker's First Unlawful Entry Into the Capitol***

Rubenacker then made his way to Capitol grounds, eventually entering the Capitol through the Senate Wing Doors at 2:13 p.m., less than one minute after the initial breach of the building. In fact, he was one of the first 50 rioters to enter the Capitol on January 6.

Rioters initially broke a window on the south side of the Senate Wing Doors, then forced open those doors by kicking them from the inside. The first screenshot below from Capitol surveillance footage shows the first rioter jumping through the broken window on the south side of the Senate Wing Doors. The cracked windowpanes on the windows north of the door are also visible. The second screenshot below, also from Capitol surveillance footage, was taken at 2:13:28—just seconds before Rubenacker entered the building. In the middle of the image, two other rioters are kicking the Senate Wing Doors from the inside. On the north side of the doors,

the image also shows one cracked windowpane and another shattered, where a rioter has already climbed through to enter the building. Notably, the surveillance video makes clear that no law enforcement officers opened the doors, nor did any officers indicate to Rubenacker and this group that they were allowed inside.





After the rioters forcefully kicked open the Senate Wing Doors, Rubenacker was among the initial wave to breach at approximately 2:13 p.m. The government has provided the Court video from outside of the Senate Wing Doors just as rioters entered the breached doors, showing screaming rioters banging on and breaking the doors and windows to unlawfully enter. *See* Gov.

Exhibit 3. Rubenacker's entry is pictured below in the screenshot from Capitol surveillance footage with Rubenacker circled in red.



Open-source video also captured the moment Rubenacker entered the Capitol. [3] Immediately upon entering, Rubenacker pulled his mask down and began screaming, "USA! USA!" while others around him streamed inside through the broken doors and windows. Continuing deeper into the Capitol, Rubenacker marched down a hall with other rioters and recorded his surroundings with his cell phone, yelling, "Holy shit! This is history! We took the Capitol!" He also later included this video in his Snapchat story. *See* Gov. Exhibit 1. The below screenshot of an open-source video shows the moment Rubenacker (circled in red) entered the building yelling.

---

[3] *See* https://www.youtube.com/watch?v=gTurnetBh4A&t=776s, from video timestamp 12:52 to 12:56.



Within one minute of breaching the Capitol, Rubenacker, along with a group of other rioters, approached Capitol Police Officer Eugene Goodman guarding the entrance to a flight of stairs. Just prior to arriving, Officer Goodman had sprinted through the Capitol to head off the rioters. En route, he encountered Senator Mitt Romney and directed him to turn around to avoid the rioters. Stills from this interaction are below.[4]

 

---

[4]*See*, https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html, at approximately video timestamp 19:42.

As the rioters approached Officer Goodman, some yelled, "Where are they counting the votes?", "Keep running, motherfucker," and "He's one person, we're thousands!" Officer Goodman placed one hand on his utility belt and used his other hand to point the rioters away from the entrance to the stairs. Rubenacker, near the front of the mob, did not leave. A still from open-source video footage is provided below with Rubenacker (circled in red) wearing a light-brown colored hood. The government has provided this video to the Court. *See* Gov. Exhibit 4.



Officer Goodman retreated backwards up the stairs, repeatedly yelling "back up!" and displaying an extendable baton. Rubenacker and others chased Officer Goodman up a flight of stairs, directly past where lawmakers had just retreated from conducting the joint session. Officer Goodman pushed back some of the rioters at the front of the crowd. Rubenacker and the others ignored the officer and pushed forward. A still from an open-source video is provided below,

showing Rubenacker (circled in red) still at the front of the mob chasing Officer Goodman up the

stairs. *See* Gov. Exhibit 4.



Rubenacker and the other rioters chased Officer Goodman to the top of the stairs and into

the Ohio Clock Corridor. There, Rubenacker and other rioters lined up and confronted Officer

Goodman and other officers who had joined the effort to hold Rubenacker and others back—feet

from the Senate Chamber. *See* Gov. Exhibit 4. Open-source video captured these events,

including Rubenacker storming up the stairs and confronting the officers with a line of other

rioters.[5] Others began screaming that they were "fucking mad!" and "this is our fucking house!," while one rioter (defendant Doug Jensen) approached the officers and yelled for them to "back up!" At that point, Rubenacker began to approach the officers. In the screenshot below from Capitol surveillance footage at 2:16 p.m., Rubenacker (circled in red) can be seen standing at the front of the mob and pointing his finger at law enforcement officers and media, with Jensen standing to his right around the time he yelled for the officers to "back up!"



Open-source photographs show the same altercation from the officers' perspective. In the below photograph, Rubenacker (circled in red) is standing at the front of the mob, holding a bottle, and pointing at officers with Doug Jensen to his right. Soon afterward, Jensen began telling the officers to "go arrest the Vice President." *See supra*, n. 5 at video timestamp 21:09.

---

[5] *See* https://www.youtube.com/watch?v=jWJVMoe7OY0&t=1222s, from timestamp 19:08 to 21:15.



Rubenacker eventually returned downstairs. At 2:18 p.m., as seen in the below screenshot from Capitol surveillance footage, law enforcement officers were ushering rioters out of the building, and Rubenacker exited the building for the first time near the Senate Carriage Doors on the east side of the Capitol.



*Rubenacker's Second Unlawful Entry Into the Capitol*

Twenty-four minutes later—after witnessing property destruction at the Senate Wing Doors, harassing law enforcement officers, and observing law enforcement officers attempt to clear the building—Rubenacker reentered the Capitol. At 2:42 p.m., Rubenacker marched through the East Rotunda doors as part of a mob of rioters just a few minutes after a violent breach. Open-source video captured this breach, during which rioters surrounded and assaulted law enforcement officers attempting to prohibit entry at the East Rotunda doors while hundreds more forcefully pushed forward up the east side stairs, causing the crowd to push the officers against the doors. The rioters screamed, "Take their shields!," "Drag 'em out!," and "We want Trump!" while pushing forward. The rioters fired pepper spray at the officers and building, beat the officers with shields and flagpoles, and fired numerous projectiles at the officers and doors. *See* Gov. Exhibit 17, from video timestamp 0:30 to 5:33. When the officers began to close the doors, numerous rioters grabbed the doors and violently pried them back open. *See* Gov. Exhibit 18. When rioters finally began entering, a woman shouted "We did it," as alarm bells blared. *See* Gov. Exhibit 17, at video timestamp 5:33.

Open-source photographs[6] and video[7] appear to show Rubenacker as part of this crowd outside the East Rotunda doors just before he breached the Capitol. While marching in as the crowd swallows law enforcement officers at the doors, alarm bells rang and numerous others screamed, "push through!" *See supra,* n.7. The below screenshot appears to show Rubenacker (circled in red) just before his entry, standing atop the stairs in the middle of a crowd of rioters.

---

[6] *See* https://www.instagram.com/p/CJxIF1oBg8K/.

[7] *See* https://www.youtube.com/watch?v=YzxvVi8wkrU&t=862s, from video timestamp 10:26 to 11:00.



Within minutes of this scene, Rubenacker entered the Capitol a second time. A screenshot from Capitol surveillance footage shows Rubenacker (circled in red) in the middle of the mob attempting to enter the building unlawfully at about 2:42 p.m. *See* Gov. Exhibit 6.



Rubenacker then marched through the Rotunda and into the Senate Hall, where a mob of rioters were chanting, "Our house!", "Fuck McConnell!", and "Push!" while advancing against a line of law enforcement officers clad in riot gear positioned feet from the Senate Chamber (now on the other side of the Ohio Clock Corridor). Some rioters at the front physically engaged with the officers and used a riot shield to push forward while others clad in military-grade tactical gear pushed and shouted, "Push! Push! Push! Get in there!" The government has provided the Court with video of these actions, *see* Gov. Exhibits 7 and 19. Below is a still from Gov. Exhibit 7, showing rioters confronting the line of law enforcement officers with the Senate Chamber in the background.



At approximately 2:45 p.m., Rubenacker pushed his way through the mob and toward the Senate Chamber, making it to approximately five rows of rioters back from the law enforcement officers. Rubenacker can be seen from behind in his light-brown-colored hood (circled below in red), with the line of officers a few rows of rioters away pointing the rioters to retreat (circled in blue). *See* Gov. Exhibit 7. Seconds later, the officers deployed chemical-irritant spray over the rioters, who retreated, and the officers partially cleared the hall. *See id.*



Rubenacker retreated to the Rotunda, filming as he walked. He joined hundreds of other rioters in the Rotunda where he smoked what appears to be marijuana. In a video he added to his Snapchat story, Rubenacker is smoking and yells, "Smoke out the Capitol, baby!" He also posted a photo of himself holding what appears to be a pipe with the caption, "Smells like freedom in here." Three stills from Rubenacker's Snapchat are below. *See* Gov. Exhibit 1.

  

18

At approximately 3:06 p.m., law enforcement officers entered the Rotunda, attempting to regain control of the area and clear rioters out of the building. As officers began physically pushing some of the rioters away, Rubenacker approached the officers rather than leave the area. *See* Gov. Exhibit 20, from video timestamp 15:09 to 15:29. A still from Capitol surveillance footage is below and shows Rubenacker (circled in red) and the officers wearing black and yellow jackets (primarily in the upper-right). *See* Gov. Exhibit 14.



As the officers continued to enter the Rotunda, Rubenacker and a crowd of rioters far outnumbering the officers began to accumulate and confront the officers. *See* Gov. Exhibit 20, from video timestamp 15:30 to 16:00. Rubenacker recorded a video of himself berating the officers, yelling, "Who are you serving? Who are you guys serving? Who are you guys serving? We are the people! Why are you not protecting us?" *See* Gov. Exhibit 9. The officer's body-worn camera also captured this altercation, and Rubenacker (circled in red) can be seen in in the Rotunda in the below screenshot. *See* Gov. Exhibit 10.



Rubenacker's clash against law enforcement officers only escalated. At approximately 3:07 p.m., a Metropolitan Police Department Officer began encouraging other law enforcement officers to "move up" in a line against the rioters. Other rioters began reacting physically against the officers, while one rioter yelled, "there's too many of us!" Rubenacker stood in the background and behind the rioters attacking the officers. He and other rioters then began to form a line and confronted the officers. One officer yelled at Rubenacker and the rioters to "go out the door" and pointed behind Rubenacker toward an exit. Rubenacker refused and repeatedly screamed, "You're a communist!" while pointing at the officer. The officers began yelling, "back up" and started pushing some of the other rioters backward. Rubenacker yelled, "we're getting pretty sick and tired of you guys!" The government has submitted body-worn camera footage that depicts these events. *See* Gov. Exhibit 21.

Eventually, Rubenacker and this line of rioters began to physically push forward against the officers, repelling the officers' efforts to clear the Rotunda. Rubenacker used his weight and force to aid the rioters' efforts. He stood his ground, and repeatedly approached the line of

officers while rioters around him yelled, "Hold the line!" Then, he, along with other rioters, pushed against the line of law enforcement officers. At least one officer successfully pushed against another rioter and Rubenacker, forcing them backward. The rioters overall, however, surged forward, forcing the line of officers back and creating space between the two opposing factions. Some rioters around Rubenacker launched themselves at the officers, swinging and kicking, and the officers responded by pushing the rioters back. *See* Gov. Exhibit 20, from video timestamp 16:00 to 16:30. The below screenshot shows Rubenacker (circled in red) pushing one rioter's back into a line of law enforcement officers who were attempting to repel Rubenacker and other rioters. *See id.* at video timestamp 16:02.



The officers escalated their efforts and continued to confront Rubenacker and the mob. Shortly after the officers slowly started to force the rioters back, Rubenacker and other rioters escalated in response. At 3:08 and 3:09 p.m., Rubenacker engaged in two assaults on law enforcement. First, at approximately 3:08 p.m., other rioters began yelling at each other to "lock

arms" while interlacing their arms and making it more difficult for the officers to move them. Soon after, Rubenacker, standing behind some of those rioters, leapt up and swung a plastic bottle and hit an officer's head. A still from Capitol surveillance footage shows Rubenacker in a red baseball hat with his right hand in the air (circled in red) just before swinging the bottle at the officer in front of him and hitting the officer on the black riot helmet. *See* Gov. Exhibit 14.



Open-source video also captured these events from the ground level.[8] The defendant repeatedly rushed toward the line of officers while they physically engaged with other rioters. His actions culminated in pushing another rioter forward against the officers just before hitting one officer's head with the bottle in his hand. In the following screenshot, Rubenacker (circled in red) is raising his bottle just before swinging as seen in the above surveillance footage.

---

[8] *See* https://www.gettyimages.com/detail/video/donald-trump-supporters-storm-the-united-states
-capitol-news-footage/1295316639, from video timestamp 0:18 to 1:22.



One minute later, at approximately 3:09 p.m., Rubenacker again approached the line of law enforcement officers physically confronting rioters and threw liquid from his bottle at a cluster of officers engaging with another individual. This assault is captured on body-worn camera footage, Capitol surveillance footage, and open-source footage. *See* Gov. Exhibits 11-14. When the liquid hit the officers, they flinched and paused, temporarily stopping their interacting with the other rioters. *See* Gov. Exhibit 13. The below stills of body-worn camera footage show Rubenacker's actions from the ground level. In the first image, Rubenacker (circled in red) is cocking his arm back to throw the liquid from his bottle. In the second, the liquid (circled in red) can be seen flying in the air toward officers. *See* Gov. Exhibit 12.





Soon after Rubenacker's assaults, law enforcement officers sprayed chemical-irritant spray at Rubenacker and other rioters in the Rotunda, aiding in the officers' attempts to clear the area. Officers eventually funneled Rubenacker and others out of the Rotunda and into the East Rotunda Doors lobby at approximately 3:13 p.m. On his way out of the Rotunda, Rubenacker yelled at officers, "This is a communist act right here. I hope you guys are proud of that. This is a communist act by you guys." *See* Gov. Exhibit 22, from video timestamp 8:00 to 8:36; *see also* Gov. Exhibit 20, from timestamp 18:00 to 18:30.

In the East Rotunda lobby, Rubenacker first moved behind a column and attempted to flush out his eyes with multiple bottles of liquid while rioters poured out of the Rotunda, into the lobby, and eventually out of the Capitol. Eventually, Rubenacker moved from behind the column to in front of it, continuing to pour water on his face and rinse the chemical-irritant from his eyes. A still from Capitol surveillance footage below shows Rubenacker (circled in red) and another rioter flushing out Rubenacker's eyes with liquid at approximately 3:17 p.m. *See* Gov. Exhibit 15. Afterward, Rubenacker sat on the ground for about one minute in front of the column.



Open-source video captured this same moment. As seen in the screenshot below, the defendant—wearing the same red baseball hat and brown-colored hood and holding a bottle—rubbed his eyes in front of the column in the East Rotunda lobby with another rioter nearby holding a water bottle and pouring water on Rubenacker's face. *See* Gov. Exhibit 20, from video timestamps 20:20 to 20:27 and 20:54 to 21:00.



Rubenacker finally exited the Capitol at approximately 3:20 p.m. after a law enforcement officer pushed him from behind and guided him out of the building. *See* Gov. Exhibit 15. A screenshot from Capitol surveillance footage is below, showing an officer push Rubenacker out of frame and out of the Capitol (both circled in red). *See id*. In total, Rubenacker was inside the Capitol for 42 minutes. Over an hour elapsed from the time of Rubenacker's first breach at 2:18 p.m. to his final exit at 3:20 p.m.



*Defendant's Statements After January 6*

Within days of the attack, Rubenacker began conducting searches online regarding the events of January 6. Specifically, he repeatedly searched on Google for "fbi pictures of rioters," as seen in the below screenshot of his browsing history on his cell phone.



Around the same time, Rubenacker began messaging other individuals that he was no longer using iMessage and was instead "Moving to signal," an end-to-end encrypted messaging

platform, because "I don't trust anyone rn" and "It's what Snowden uses." He also searched for methods to encrypt an iPhone—the same type of cell phone he carried into the Capitol and used to record multiple videos he posted to social media.



As detailed above, Rubenacker also posted about his actions on January 6 in a Snapchat "story" that included at least four spliced videos. The story begins with a video of Rubenacker's hand holding a flyer that says "End CCP," apparently referring to the Chinese Communist Party, with the Washington Monument in the background. The next video shows other individuals on the National Mall with the header, "America is pissed." In the third video, Rubenacker is inside the Capitol, saying, "Holy shit! This is history! We took the Capitol!" In the final video, he turns the camera on himself while in the Rotunda, smoking what appears to be marijuana, and says "America, baby! About time. Smoke out the Capitol, baby. Hell yeah."

Finally, Rubenacker engaged in text message conversations with other individuals about his actions at the Capitol on January 6. On January 27, 2021, another individual texted Rubenacker, "What happened a few weeks back… when I saw your involvement in it through snap, my first reaction was to just delete so I don't see any of it. Once things calmed down a bit I

added you again . . . . More than anything I want you to know you can have your own beliefs and I respect them, but I am disappointed that you'd get involved in that kind of behavior at the capital." In response, Rubenacker texted "I'm trying to understand what did that do that offended you so much and what violence did I do?" Thirty seconds later, Rubenacker texted, "My beliefs are constitutional beliefs." On February 2, 2021, Rubenacker texted another individual a series of messages related to his actions on January 6, including, "Y'all have video of me in the capital? Fuck u," "Was let into the capital by police," and "These cock suckers need facts."

In at least one text conversation, Rubenacker expressed anger toward another individual for posting something publicly online related to Rubenacker's actions at the Capitol on January 6. Rubenacker responded, "Playing with my freedom I guess is funny to you and I did zero violence." *See* Gov. Exhibit 23 at video timestamp 0:05. As seen in the below screenshot, Rubenacker later explained that he had "fought for [people's] constitutional rights." *See* Gov. Exhibits 16. This individual, in Rubenacker's words, had "betrayed" him. *See id.*



## III.    THE CHARGES AND DEFENDANT'S PLEA

On November 10, 2021, a federal grand jury returned a superseding indictment charging the defendant with Civil Disorder in violation of 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count Two); Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Count Three); Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) (Count Five); Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4) (Count Six); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Seven); Impeding Passage Through the Capitol Grounds and Buildings in violation of 40 U.S.C. § 5104(e)(2)(E) (Count Eight); Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Nine); and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Ten). On February 2, 2022, the defendant pleaded guilty to all counts of the Superseding Indictment without a plea agreement.

## IV.    STATUTORY PENALTIES

The defendant now faces sentencing on all counts of the Superseding Indictment.

As noted by the U.S. Probation Office, the defendant faces:

- Up to 5 years of imprisonment, a fine of up to $250,000, and a term of supervised release of not more than 3 years for Count One, Civil Disorder;

- Up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding;

- Up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release

of not more than three years for Count Three, Assaulting, Resisting, or Impeding Certain Officers;

- Up to 1 year imprisonment, a fine up to $100,000, and a term of supervised release of not more than 1 year for Counts 4-6, Entering and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, and Engaging in Physical Violence in a Restricted Building or Grounds, respectively; and

- Up to 6 months imprisonment and a fine of up to $5000 for Counts 7-10, Disorderly Conduct in a Capitol Building; Impeding Passage Through the Capitol Grounds or Building; Act of Physical Violence in the Capitol Grounds or Building; and Parading Demonstrating, or Picketing in a Capitol Building, respectively.

*See* Presentencing Report ("PSR") at 1-2.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the final PSR. The Guidelines do not apply to four of the counts to which Rubenacker pleaded guilty— Counts Seven, Eight, Nine, and Ten. *See* PSR ¶ 47. The remaining counts group together, PSR ¶¶ 48, 48a, 48b, and the proper offense level calculation is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2J1.2(a) | 14 |
| Specific Offense Characteristic: Causing or Threatening Physical Injury to Obstruct Administration of Justice (U.S.S.G. §2J1.2(b)(1)(B)) | +8[9] |
| Specific Offense Characteristic: Offense Resulted in Substantial Interference with the Administration of Justice (U.S.S.G. §2J1.2(b)(2)) | +3 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a) and (b)) | -3 |
| Total Offense Level | 22 |

*See* PSR ¶¶ 50-60.

Because Rubenacker's criminal history score is zero, his Sentencing Guidelines range is 41 to 51 months. For counts Four through Six, however, the maximum sentence is 12 months. And for the non-Guidelines counts (Counts Seven through Ten), the maximum sentence is six months.

*"Administration of Justice" under U.S.S.G. §§ 2J1.2(b)(2)*

The PSR correctly rejected Rubenacker's objections to the application of the enhancements in U.S.S.G. § 2J1.2(b)(2). The three-level increase applies where "the offense *resulted in* substantial interference with the administration of justice. USSG § 2J1.2(b)(2) (emphasis added). The Guidelines define the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental*

---

[9] The defendant's threatening conduct toward and assaults of multiple law enforcement officers protecting the Capitol and Members of Congress during the certification of the 2020 Electoral College vote renders this provision applicable. Separately, the defendant's actions smoking what appears to be marijuana and spraying liquid inside the Rotunda renders this provision applicable. *See, e.g.*, *United States v. Jacob Chansley*, Case Number 21-cr-3-RCL; *United States v. Scott Fairlamb*, Case Number 21-cr-120-RCL.

*or court resources*." USSG § 2J1.2 cmt. n.1 (emphasis added). The offenses that Rubenacker committed on January 6 resulted in substantial interference with the administration of justice because the offenses involved the unnecessary expenditure of governmental resources.

That commonsense view finds support in the case law. For example, district courts have relied on the phrase "the unnecessary expenditure of substantial government or court resources" to apply subsection (b)(2)'s three-level enhancement to interference with non-judicial proceedings and to obstruction that led to the government's expenditure of resources. In *United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017), a court applied the specific offense characteristic after numerous federal agents "worked for several days around the clock" to bring a defendant's children back to the United States after the defendant violated an international parental kidnapping statute. Likewise, a court applied the specific offense characteristic after defendants interfered with OSHA investigations into a workplace accident. *See United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009). A separate court applied the enhancement after a defendant withheld subpoenaed documents from a congressional subcommittee. *See United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998). And, finally, the Eleventh Circuit recently cited affirmatively to another case in which it found Section 2J1.2(b)(2) applicable where, as a result of the defendant's false grand jury testimony, the *government* was forced to identify and interview several other witnesses, review the defendant's records, and reconvene the grand jury. *See United States v. Pegg*, 812, F. App'x 851, 860 (11th Cir. 2020) (citing *United States v. Johnson*, 485 F.3d 1264, 1271–72) (11th Cir. 2007)); *see also United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015) (affirming the application of the enhancement because significant "government" resources were invested to resolve the defendant's attempts at obstruction); *United States v. Tankersley*, 296 F.3d 620, 623–

24 (7th Cir. 2002) (same); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996), *as modified on reh'g* (Apr. 17, 1996) (same); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996) (same).

The events of January 6, 2021 indisputably resulted in the "unnecessary expenditure of substantial governmental . . . resources," with the latest estimate of damages from the Architect of the Capitol, the Capitol Police, the House Chief Administrative Office, and the Senate Sergeant at Arms totaling at least $2,734,783.14. And Rubenacker's offenses—along with similar offenses committed by many others—without question contributed to that "unnecessary expenditure of substantial governmental resources": the deployment of hundreds of law enforcement officers, and ultimately National Guardsmen and Guardswomen, to defend and then clear the Capitol building and grounds of those—such as the defendant here—whose conduct caused the evacuation of hundreds of lawmakers and the suspension of the Certification proceedings. The repair and clean-up costs were similarly extensive—and certainly "substantial." In short, the breach delayed the electoral certification by more than five hours, caused nearly three million dollars of damage to the Capitol, triggered an overwhelming police response, and required a massive security response up to and through the inauguration. *See Ali*, 864 F.3d at 574 (noting that involvement by various agencies working through the night amounted to substantial expenditure, notwithstanding the government's failure to supply cost estimates related to these expenses). Rubenacker's conduct for nearly an hour inside the Capitol on January 6 contributed to this massive expenditure of governmental resources.

This reading of the specific offense characteristic at issue also finds support in § 1B1.3(a)(3), which includes as relevant conduct "all harm that resulted from" or "was the object of" the defendant's acts (or the acts of others engaged in jointly undertaken criminal

activity). Here, the defendant's actions meet both of those. The substantial interference enhancement pursuant to § 2J1.2(b)(2) focuses on whether the end result—the obstruction itself—was substantial. Here, it was. There is no question that the defendant's and others' actions directly resulted in delaying the joint session of the United States Congress for the Certification of the Electoral College Vote regarding the 2020 presidential election for multiple hours, in addition to the various expenditures detailed above required to address this obstruction.

Finally, judges of this Court have applied specific offense characteristics related to the "administration of justice" in several other Capitol riot matters, including *United States v. Hodgkins*, 21-cr-188-RDM; *United States v. Fairlamb*, 21-cr-120-RCL; *United States v. Chansley*, 21-cr-3-RCL; and *United States v. Wilson*, 21-cr-345-RCL. The court should do the same here.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the United States Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed,

it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily in favor of a significant term of incarceration. The defendant entered the Capitol building not once but twice over the course of an hour—wreaking havoc for over 40 minutes inside. Rubenacker first entered

36

the building less than a minute after the initial breach, mere seconds after other rioters kicked open the doors through which he entered. Indeed, he was one of the first 50 rioters to enter the Capitol that day. Once inside, he explained exactly what he was doing on Snapchat: he "took the Capitol."

While inside, he encouraged violence by chasing Capitol Police Officer Eugene Goodman up a flight of stairs, directly past an area where lawmakers had retreated. Indeed, if the officer had not deliberately led the group of rioters away from the Senate chamber—to which there was an unimpeded path—Rubenacker and the rioters with him might have come face to face with U.S. Senators. Rubenacker then approached and berated another line of law enforcement officers while others around him screamed for the officers to move out of their way and to arrest Vice President Pence—all feet from the Senate Chamber where the Vice President was by law to be serving as President of the Senate and overseeing the Electoral College Certification vote. Rubenacker thereafter exited the building and had the opportunity to leave for good. Instead, he walked around the Capitol grounds and reentered the building through another entry point 20 minutes later after a violent breach of the East Rotunda Doors.

Rubenacker's conduct escalated during his second time inside the Capitol. He joined a mob forcefully pushing against a line of riot-gear clad officers who were attempting to stop the rioters from reaching the Senate Chamber. This was the second time within an hour that Rubenacker was part of a group advancing toward that area, this time from another entry point. It took the law enforcement officers deploying chemical-irritant spray to finally repel Rubenacker and the mob from the Senate Hall and back into the Rotunda. There, Rubenacker filmed himself smoking marijuana and claimed to "smoke out the Capitol." Several minutes later, he again berated law enforcement officers, calling them "communists."

Not content to yell at officers, Rubenacker got physical and assaulted them. First, he swung a plastic water bottle at an officer's head while that officer was attempting to remove rioters from the Rotunda. Next, Rubenacker threw liquid at multiple other officers from his water bottle. Although the liquid was apparently water, *see* PSR ¶ 26, Rubenacker had repeatedly drunk from the bottle while in the Capitol, and he threw the bottle's contaminated contents at multiple officers during the middle of a pandemic. Moreover, the officers would not have initially known what kind of liquid had hit them. In fact, video shows that when the liquid hit the officers, it temporarily caused them to cease engaging with another rioter who had physically confronted them.

After the attack, Rubenacker posted a story to his Snapchat account, detailing many of his actions on January 6. By posting this story after the January 6 riot, Rubenacker demonstrated a significant lack of remorse. Further, he took steps consistent with trying to hide his role in the attack on January 6, searching for "fbi photos" and how to "encrypt" his iPhone, and encouraging his contacts to switch to encrypted messaging services. And he knew what he had done was illegal, messaging to another individual that posted something publicly online that he had played with his "liberty" and "betrayed" him. Indeed, apart from Rubenacker's limited statements to the PSR drafter, the government has no evidence that Rubenacker is remorseful for his conduct on January 6. As he would describe it to another individual by text message, he "fought for [others'] constitutional rights."

The seriousness of Rubenacker's conduct, including his early entry into the building, his attacks on law enforcement, his reentry into the building, and his statements in text messages of the need to "fight" demand a lengthy sentence of imprisonment.

## B.       The History and Characteristics of the Defendant

The defendant does not have a criminal history and has been compliant with the conditions of pretrial release. The defendant does not have steady employment and admits to being a daily user of marijuana, though his conditions of supervision do not require drug testing.

## C.       The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[10] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rubenacker's criminal conduct, assaulting law enforcement officers and corruptly obstructing an official proceeding, is the epitome of disrespect for the law. When Rubenacker entered the Capitol grounds, and the Capitol itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[10] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). Both are at issue here.

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[11] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

---

[11] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Although the defendant has a criminal history category of I, he has expressed little remorse for his actions on January 6. In fact, the government's only indication that Rubenacker is remorseful for his actions is in the statement he made to the PSR drafter. Rubenacker provided a three-sentence written statement to the drafter, stating, "I'm learning to be the best person I can be. I don't watch politics anymore. I go therapy every week." This is not remorse. Rubenacker did not address his conduct on January 6. He did not apologize to the officers he assaulted. He did not address the significant cost he imposed upon the lawmakers, officers, aides, staffers, support staff, and others around him that day. He did not speak to the rippling effect his and others' actions had on this country's standing as a leading democratic republic. Rubenacker's serious crimes, combined with his lack of remorse, demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and

appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

In fact, probation is also recommending a guidelines sentence—specifically, a sentence of 41 months' incarceration. According to probation, this guidelines recommendation adequately punishes the defendant's actions that "display[ed] a disregard for public order and jeopardized human life." ECF 53, Probation Sentencing Recommendation, at 3. Apart from adequate punishment, probation has noted that a guidelines term of imprisonment would act "as a deterrence for others and provide[] some level of protection for the community from the defendant's future crimes." *Id*.

## F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to obstructive conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified. Comparison to other January 6 defendants is more apt.

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors to assault on law enforcement officers, such as is the case here. Each offender must be sentenced based on

their individual circumstances but with the backdrop of the January 6 riot in mind.

While the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "record" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed on Scott Fairlamb, Duke Wilson, and Devlyn Thompson, for reference. Scott Fairlamb, 21-cr-41-RCL, pleaded guilty to violations of 18 U.S.C. §§ 1512(c)(2) and 111(a)(1) and was sentenced to 41 months incarceration and 36 months supervised release. Fairlamb, like Rubenacker, entered through the Senate Wing Door about a minute after the initial breach, although Fairlamb was brandishing a police baton when he entered. Like Rubenacker, Fairlamb assaulted a law enforcement officer while inside the Capitol and made statements after the riot suggesting he was proud of his actions. Notably, several mitigating factors are present in Fairlamb's case that are not present here. Fairlamb, unlike Rubenacker, showed sincere remorse for his actions, and he was also one of the earliest felony pleas in a Capitol riot case. *Fairlamb*, Sen. Tr. at 37. And Rubenacker spent a considerable amount of total time in the Capitol after breaching the building not once, but

twice—accosting law enforcement officers trying to repel him and other rioters, smoking marijuana, and pushing through multiple areas of the building.

Duke Wilson, 21-cr-345-RCL, pleaded guilty to 18 U.S.C. §§ 1512(c)(2) and 111(a)(1) and was sentenced to 51 months incarceration and 36 months supervised release. Wilson participated in the attack on law enforcement at the Capitol's lower west terrace, arguably the most violent area of the Capitol riot on January 6. Wilson struck officers with a PVC pipe and threw the pipe at officers. Rubenacker also engaged in multiple assaults, but unlike Rubenacker, Wilson did not enter the building, let alone do so twice. And Rubenacker did not merely enter the building; he was also one of the first rioters through the breached Senate Wing Doors and, after entering, began chasing Officer Goodman throughout part of the Capitol. Rubenacker sought out this confrontation nearly immediately upon entering the building while others around him screamed asking where the elected officials were counting the votes. And his actions impeding the proceeding and law enforcement officers continued for nearly an hour. As made clear by Wilson's sentence, a sentence at the low-end of the guidelines would not be appropriate here.

Devlyn Thompson, 21-cr-461-RCL, pleaded guilty to 18 U.S.C. §§ 111(a)(1) and (b) and was sentenced to 46 months' imprisonment. The defendant assaulted an officer with a police baton while on the Lower West Terrace, threw a large box speaker at a line of police officers, and stayed in the area of some of the most vicious assaults for multiple hours. Similarly, Rubenacker engaged in multiple assaults on law enforcement officers and remained on Capitol grounds and in the Capitol building for at least an hour. Rubenacker, however, was among the first 50 people to enter the Capitol, he chased Officer Goodman within a minute of entering the building, he reentered the building 20 minutes after his initial exit, and repeatedly engaged in

harassing and assaultive conduct against law enforcement in and around the Rotunda. In all, the defendant pled guilty to multiple felonies and misdemeanors. None of these aggravating factors are present in Thompson's case. Finally, Thompson, unlike Rubenacker, has been diagnosed with autism spectrum disorder, which his defense counsel argued at sentencing made him "uniquely vulnerable to what was going on on the Capitol grounds that day." *Thompson*, Sen. Tr. at 12-14, 29.

Finally, it is important to note the differences between Rubenacker's case and that of Mark Leffingwell, 21-cr-5-ABJ. Leffingwell pled guilty to violating 18 U.S.C. § 111(a). He entered the Capitol and remained just inside the Senate Wing Door. He ignored multiple officer commands to back up and away from the Senate Wing Door, and eventually officers began pushing people back and out of the door. In response, Leffingwell punched two officers in the face. The Court imposed a sentenced of 6 months' imprisonment, well below the bottom of the Guidelines, noting the defendant's sincere contrition, his prior military service, and the fact that he suffered from a traumatic brain injury while serving in the military that may give him difficulty functioning in an institutional environment. *Leffingwell* Sen. Tr. at 53. Rubenacker, by contrast, has failed to show remorse after spending nearly an hour on Capitol grounds and inside, smoking marijuana inside, charging after officers, and engaging in two assaults on January 6. Also, unlike Leffingwell, Rubenacker was one of the first people inside the building that day, and, almost immediately upon entering, he began to chase Officer Goodman up the stairs and toward the Senate Chamber. Rubenacker's actions are dissimilar to Leffingwell's conduct, and a low-end guidelines sentence would be inappropriate in this matter.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose

restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[12] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain

---

[12] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[13]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the

---

[13] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[14]

Applying these principles to this case leads to the conclusion that Rubenacker should be required to pay $2,000 in restitution. One of the offenses to which he has pleaded guilty, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii), and a second offense, 18 U.S.C. § 1752(a)(4), separately triggers the MVRA as a "crime of violence," *see* 18 U.S.C. § 3663A(c)(1)(A)(i). Moreover, Rubenacker's additional convictions under Title 18, *see* Count 1 (18 U.S.C. § 231(a)(3)); Count 2 (18 U.S.C. § 1512(c)(2)); Count 3 (18 U.S.C. § 111(a)(1); Count 5 (18 U.S.C. § 1752(a)(2)), fall within the VWPA. As described in detail above, Rubenacker's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees. A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Rubenacker should be responsible is $2,000. That is the same amount that defendants convicted of felony offenses in connection with the events of January 6 have typically

---

[14] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

agreed to pay under their plea agreements.

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). Here, Rubenacker should be directed to pay $2,000 as an approximate estimate of the losses for which he is responsible.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 46 months, which is a mid-range sentence as calculated by the government, 3 years' supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _____*/s/ Laura E. Hill*_____            _____
       LAURA E. HILL                           TROY A. EDWARDS, JR.
       NV Bar No. 13894                        N.Y. Bar No. 5453741
       Trial Attorney, Detailee                Assistant United States Attorney
       U.S. Attorney's Office                  United States Attorney's Office
       175 N Street, NE, 9th Floor             District of Columbia
       Washington, D.C. 20002                  601 D Street NW,
       202-598-3962                            Washington, D.C. 20530
       Laura.E.Hill@usdoj.gov                  (202) 252-7081
                                               Troy.Edwards@usdoj.gov

## Exhibit and Attachment List

**Exhibits**
1. Exhibit 1 – Rubenacker Snapchat Video
2. Exhibit 2 – Senate Wing Door CCTV Screenshot
3. Exhibit 3 – Open Source Video of Pursuit of EG 1
4. Exhibit 4 – Open Source Video of Pursuit of EG 2
5. Exhibit 5 – Ohio Clock Room CCTV
6. Exhibit 6 – East Rotunda Doors CCTV
7. Exhibit 7 – Open Source Video of Senate Hall
8. Exhibit 8 – Rubenacker Snapchat Photograph
9. Exhibit 9 – Rubenacker Cell Phone Video
10. Exhibit 10 – Ofc NR BWC Clip
11. Exhibit 11 – Open Source Video of Rotunda
12. Exhibit 12 – Ofc KDP BWC Clip
13. Exhibit 13 – Ofc BR BWC Clip
14. Exhibit 14 – Rotunda CCTV
15. Exhibit 15 – East Rotunda Doors CCTV 2
16. Exhibit 16 – Rubenacker Cell Phone Messages Screenshot
17. Exhibit 17 – Open Source Video of East Rotunda Doors Breach
18. Exhibit 18 – Open Source Video of East Rotunda Doors Breach 2
19. Exhibit 19 – Open Source Video of Senate Hall 2
20. Exhibit 20 – Open Source Video of Rotunda 2
21. Exhibit 21 – Ofc AA BWC Clip
22. Exhibit 22 – Ofc RM BWC Clip
23. Exhibit 23 – Rubenacker Cell Phone Messages Screen Recording

*Note that 23 photographs and videos have been provided via electronic communication to the Court and defense counsel. The government does not object to the public release of any of the above photographs or videos.*

**Attachment**
1. Table 1 – Capitol Siege Sentences